AUG 28 2020 PM 2:21
FILED - USDC - CT - BPT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JAKUB MADEJ,
    Plaintiff,

    v.

YALE UNIVERSITY, YALE HEALTH,
PATRICK M. NOONAN, HAROLD
ROSE, CAROLINE HENDEL, PAUL
GENECIN, LORRAINE SIGGINS,
DOES 1-10
    Defendants.

Civil Action No.
3:20cv991(JCH)

JURY TRIAL DEMANDED

AUGUST 28, 2020

## AMENDED COMPLAINT

*"When I reported what happened to the authorities at Yale . . . they tried to cover up what happened—and told me not to tell anyone, not even my roommate" ... "My school betrayed me."*

A.B., a Yale alumna, about seeking help from Yale College administration

*"Rather than their first instinct being to help me, their instinct was to treat me as a liability."*

J.D., a Yale College student, about Yale Health

Plaintiff Jakub Madej files this Complaint against defendants Yale University, Yale Health, Patrick M. Noonan, Caroline G. Hendel, Harold Rose, Paul Genecin, Lorraine Siggins, and Does 1-10, and respectfully alleges as follows:

## I.  INTRODUCTION

1.    This action arises from Yale University's egregious mistreatment of its own students voicing concerns about mental health on Yale's campus, and from Yale's

coordinated fraud on students who sought confidential mental health treatment at Yale Health, an on-campus medical clinic.

2.      Yale offers "free" mental health treatment to its students, and more than 2,600 of these students seek psychiatric counseling services every year. Students confide in their assigned therapists the most private and sensitive thoughts imaginable, believing what they reveal is kept confidential. Yale offered such representations extensively since at least early 2015. But in plain sight, Yale University's senior management regularly accessed student psychiatric records without students' knowledge or consent as part of University's internal "risk management" program to pre-emptively classify students as potential threats, and eventually dismiss them before any "undesirable" event could occur within the University's walls, and for which Yale could be held liable.

3.      The scheme was implemented after several students committed suicide in 2014 and 2015, bringing nationwide publicity to Yale, threatening the University's position in the rankings, and exposing it to potential litigation. Conspirators orchestrated the ploy to leave no paper trail of disclosure, and succeeded in involuntarily withdrawing tens of undergraduates designated as "reputational threats" motivated solely by Yale's business judgment. This effort was spearheaded by several attorneys entrenched in power since 1990s and employed by the University's General Counsel's Office, all to ensure that any evidence of wrongdoing could be plausibly concealed under the veil of so-called attorney-client privilege whenever an individual litigant sought redress in a court of law.

4.     Yale Health's leadership has knowingly participated in the conspiracy, exploited the false sense of security for University's self-gain, and continually turned a blind eye to moral qualms. Yale's unconscionable betrayal of trust that Yale students freely extend to the University continues to this day.

5.     Plaintiff, a Yale College student, was stabbed in an armed robbery, and sought treatment at Yale Health's mental health & counseling department. Distraught by what he saw, he investigated Yale Health's actions beyond the marketing statements offered by Yale through official channels. Yale then used his confidential psychiatric records to intimidate him and force him to cease his investigations into Yale's unethical conduct, all while officially claiming that no disclosure was ever made. Plaintiff's records contained sensitive and potentially damaging information about his history of depression, anxiety, and personal relationships.

6.     Yale Health engaged in fraud when it falsely represented to Plaintiff, and to thousands of unsuspecting students, that mental health services provided at Yale Health are strictly confidential when, in fact, Yale administrators actively and freely accessed students psychiatric records at will.

7.     Yale University engaged in fraud when it falsely claimed that it has no means to access the psychiatric data collected at Yale Health when, in fact, it used this information unlawfully and extensively for Yale's business purposes.

8.      Yale lacks any mechanism or protocol to investigate the alleged practices within the University. Yale does not have a meaningful whistleblower program for any employee to report wrongdoing described herein.

9.      The allegations herein are based upon expert analysis, the investigation of Plaintiff's counsel, and information and belief.

10.     Plaintiff seeks a declaratory judgment proclaiming Yale's conduct unlawful, a permanent injunctive relief prohibiting Yale's executives from accessing student psychiatric information, compensatory damages for monetary and intangible losses suffered by Plaintiff as a result of Yale's willful, wanton, reckless, and fraudulent conduct, and punitive damages sufficient to deter Yale from engaging in the described fraud in the future.

## II.   PARTIES

11.     Plaintiff Jakub Madej resides in New Haven, Connecticut. He has been a student at Yale College since 2016.

12.     Yale University is an investment management company with its principal place of business in New Haven, Connecticut. Yale University also operates in the business of higher education, and offers education services on its New Haven campus. Yale is a private corporation, does not issue any stock, and is effectively controlled by a small number of executives.

13.     Yale Health is a medical clinic on the Yale University's campus. Yale Health offers mental health and counseling services ("MH&C") for Yale students. Yale Health is located at 55 Lock St in New Haven, Connecticut.

14.     Patrick M. Noonan is a natural person. An attorney by training, he represents almost exclusively Yale University and Yale-New Haven Hospital, a related business entity. Mr. Noonan resides at 137 Overshores W in Madison, Connecticut. His phone number is (203) 245-1678.

15.     Harold Rose is a natural person. He joined the University's Office of the General Counsel in 1997. Mr. Rose resides at 100 Mountain View Terrace in North Haven, Connecticut. His phone number is (203) 248-2508.

16.     Caroline G. Hendel is a natural person. She joined the University's Office of the General Counsel in 1990. Ms. Hendel resides at 150 E Rock Rd in New Haven, Connecticut. Her phone number is (203) 752-1217.

17.     Paul Genecin is a Chief Executive Officer of Yale Health. He has worked at Yale Health since 1989. Genecin prepared, reviewed and was responsible for the everyday operations of Yale Health, and for approving official statements made on behalf of the clinic. Mr. Genecin resides at 340 Saint Ronan St in New Haven, Connecticut. His phone number is (203)-432-0076.

18.     Lorraine Siggins has been a director of Yale Mental Health and Counseling until June 2019. Ms. Siggins resides at 330 Audobon St in New Haven, Connecticut.

19.     Does 1-10 are natural people. Plaintiff does not know Does' identities or location at this time. Plaintiff will amend his complaint to name Does 1-10 when their identities are learned.

III.    **JURISDICTION AND VENUE**

20.    This Court has original diversity jurisdiction over this dispute under 28 U.S.C. §1332 because Defendants and Jakub are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.    This Court has personal jurisdiction over Yale because it conducts business in Connecticut.

22.    Venue is proper in this district under 28 U.S.C. § 1391(b)(1) and (2) because all Defendants reside in this district, and the acts giving rise to this lawsuit occurred within this District.


IV.    BACKGROUND

### The Business Reality of Yale University

23.    Yale University operates in the business of higher education. Its business model has three main prongs:

    i.    Yale sells undergraduate students its education services in exchange for tuition;

    ii.    Yale pays "scholarships" to Ph.D. candidates, who perform a lion share of teaching duties that encompass the educational services mentioned above;

    iii.    Yale hires faculty, who turn a portion of taxpayer-funded grants to the University's budget, and transfer the legal right to their inventions to Yale.

24.     Yale houses enrolled undergraduate students on its New Haven, Connecticut campus. Incoming students must pay Yale for room and board, as well as ancillary services such as insurance and course fees. Included are "free" mental health services at Yale Health, an on-campus clinic.

25.     Yale has been regarded as perhaps the most prestigious college in the country for decades. The Yale brand is widely recognized outside the United States, and the Yale education is highly desirable in Asia. At least thirty businesses in China alone offer consulting services priced at over $100,000 to help prospective students secure admission to Yale.

26.     Yale's most valuable asset is its reputation, valued in billions of dollars.

27.     Yale is effectively governed by a small number of administrators, aka corporate officers, who wield extraordinary power over the budgeting, planning, and all university operations. Because Yale is a non-stock corporation, it has no shareholders that monitor Yale's operations, and no owners incentivized to ensure that decisions made by Yale's management are informed by any rules of ethics or principles of professional responsibility. Rather, Yale's corporate actions are motivated by self-dealing, the principle of least effort, and primal instincts of corporate survival.

28.     Yale is not a public corporation, and its internal governance is not subject to any external scrutiny. Yale's corporate governance mechanisms are unknown to anyone but to Yale's current corporate officers, who are effectively not accountable to any collective body or, in fact, anyone. Most decision-making processes

at Yale entirely informal and unwritten, even when official policies are available and purport to establish mechanisms how the University does what it does. No genuine oversight exists over Yale's operations. As such, Yale's inner workings are shrouded in secrecy.

29.     Yale's corporate instincts are motivated not by profit paid to shareholders, which Yale does not have, but the desire for the corporation to survive, for the reputation to stay untouched; in other words, to change as little as possible, and to conserve the current state of affairs. To this end, Yale's management avoids scrutiny by the federal government and the courts to the maximum extent possible.

30.     Yale's administrators award themselves large compensation, scant and unverified details of which can be found in the University's tax filings.

| | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| Peter Salovey | $572,000 | $643,000 | $801,000 | $1,187,000 | $1,366,000 | $1,479,000 | $1,683,000 |
| Alexander Dreier | X | X | X | X | $568,000 | $651,000 | $715,000 |
| Kimberly Goff-Crews | X | $230,000 | $412,000 | $420,000 | $434,000 | $441,000 | $463,000 |
| Michael Peel | $549,000 | $583,000 | $599,000 | $621,000 | $640,000 | $663,000 | $663,000 |
| Benjamin Polak | X | $319,000 | $572,000 | $598,000 | $627,000 | $642,000 | $684,000 |
| Scott Strobel | $416,000 | $417,000 | $432,000 | $476,000 | $512,000 | $513,000 | $545,000 |
| Bruce Alexander | $533,000 | $554,000 | $574,000 | $588,781 | $611,00 | $618,000 | $651,000 |
| John Bollier | $379,000 | $406,000 | $422,000 | $438,000 | $454,000 | $448,000 | $470,000 |
| Joan O'Neill | X | $440,000 | $520,000 | $527,000 | $551,000 | $560,000 | $592,000 |
| Linda Lorimer | $695,000 | $1,749,000 | $623,000 | $597,000 | $556,000 | $894,000 | X |
| Dorothy Robinson | $533,000 | $615,000 | $615,000 | $1,666,000 | $584,000 | $605,000 | $573,000 |

*Table I: Compensation of selected Yale University corporate officers, as reported in Yale University's 990s filed with the Internal Revenue Service.*

## Mental Health at Yale: Part I

*"Yale deals with mental health by 'creat[ing] a culture of shame and silencing and self-silencing'"*

J.D., a Yale College alumna studying psychology, about mental health at Yale

31.     Yale houses approximately 5,500 undergraduate students on its New Haven campus. These students move from their homes to Yale for many semesters; they live together in dorms, attend classes, organize in student groups, and engage in common activities. Students living at Yale build their new world in New Haven: make friends, find spouses, establish relationships with professors, find jobs, and more.

32.     Yale students, although unusually gifted, are similar to most people in that they frequently experience psychological concerns. The term "psychological concern" refers to depression, stress, anxiety, and other patterns of behavioral or psychological symptoms, which are frequently yet pejoratively referred to as mental disorders or psychiatric disorders. (For the purposes of this complaint, the latter terms will not be used.)

33.     Few students discussed their concerns openly, especially when they relate to sexual abuse or abusive experiences at the University. Many Yale students report an omnipresent stigma against revealing their true opinions and inner feelings while at Yale.

34.    In 2014, Yale Law School's Mental Health Alliance reported that 70% of law students at Yale Law School reported mental health challenges during law school[1]. The Alliance's Report revealed that Yale Health is governed by several unwritten rules, which resulted in students reporting inferior access to mental health treatment. The Report concluded that Yale Law "must improve access to clinical mental health treatment for students". Other student groups at Yale reported similar findings at Yale College in 2013 and 2018.

35.    Mental health concerns are widely present in higher education today, as they have been for years. In 2014, Newsweek[2] described the mental health of college students as a "perennial concern".

36.    According to the American Psychological Association, anxiety is the top presenting concern among college students (61 percent), followed by depression (49 percent) and family issues (31 percent)[3]. In 2019, 34% of college students in the United States received mental health treatment, including therapy or medication[4]. Yale Health states on its website that one half of all Yale students sought mental health treatment at its facilities.

37.    Today's uncertain environment poses constant threats to Yale's reputation, with mental health issues being a primary concern. Every unfavorable event, especially if publicized, threatens the University's position among its peer

--------

[1]
https://law.yale.edu/sites/default/files/area/department/studentaffairs/document/falling_through_the_cracks.pdf
[2] https://www.newsweek.com/2014/02/14/how-colleges-flunk-mental-health-245492.html
[3] https://www.apa.org/monitor/2017/09/numbers
[4] https://www.apa.org/monitor/2019/12/numbers-college

universities. This includes a numerical position in college rankings, an informal perception of university's standing compared to other schools, and amount of positive or negative attention in the media. Yale is scrambling to find ways to prevent or mitigate those risks, a task essential its "long-term sustainability".

38.     Students that exhibit mental health concerns pose a discernible reputational threat to Yale University in that Yale's management perceives them as more likely to engender legal liability, provoke undesirable events, and give rise to negative publicity to the University. S.M., a Yale College alumnus, aptly summarized this feeling in human language: "[at Yale,] mentally ill students as liabilities rather than as students suffering from an illness". "The University has, time and time again, abrogated its responsibility to its most vulnerable students and resisted reforms that Yale students have been suggesting for years," wrote another Yale student in 2015.

39.     United Educators (UE) is an organization that provides liability insurance and risk management services to more than 1,600 colleges and universities throughout the United States. As one of seven "reputational risk management best practices", UE recommends establishing "a monitoring system that will give early notification to emerging reputational damage to your institution".

40.     "The mechanism for monitoring, tracking, and responding should be flexible enough to encompass unforeseen events but focused so that the institution is scanning the environment and surprises are minimal," UE writes.

## Mental Health at Yale: Part II

41.     In 2015, Luchang Wang was a Yale College sophomore. On January 27, 2015, at 1:26 p.m, she shared the following post on her Facebook page:

> Dear Yale: I loved being here. I only wish I could've had some time. I needed time to work things out and to wait for new medication to kick in, but I couldn't do it in school, and I couldn't bear the thought of having to leave for a full year, or of leaving and never being readmitted. Love, Luchang.

42.     Minutes later, Wang crossed over the rail of the Golden Gate Bridge and jumped into the San Francisco Bay below.

43.     Ms. Wang's wish, which she explicitly and recently stated to many of her friends, was that her experience be used to change the withdrawal process at Yale, as soon as the process could not be used against her.

44.     But Yale University never entertained a thought that Wang's death might have been related to, much less caused by, anything at Yale, or anything that Yale might in any way be responsible for. Yale never investigated events that led to Ms. Wang's tragic death, and had no interest in learning what role the University played in her poignant story.

45.     Wang's death triggered nationwide attention and an on-campus debate about the state of mental health at Yale. Thousands of students, alumni, and donors threatened to withhold donations to the University absent change.

46.     In the weeks following Wang's death, Yale students have expressed frustration over the University's conduct as it pertains to withdrawals. The Atlantic disclosed that students conveyed a significant fear that the administration would force students who report mental health problems to leave campus, and would not be allowed to return.

# Student death raises questions on withdrawal policies

RACHEL SIEGEL & VIVIAN WANG | 2:39 AM, JAN 29, 2015
STAFF REPORTERS

Hours before Yale College Dean Jonathan Holloway informed the campus community of the death of Luchang Wang '17, the student herself had posted a suicide note on Facebook. In her message, she bid goodbye to her loved ones and to Yale.

The end of Wang's note — in which she discussed her fears about taking time off from Yale and not being allowed to return — casts new light on a campus debate about how the University handles cases of mental illness, withdrawal and readmission. While some students have criticized the University's policies as cold and demanding, others have emphasized the complex confluence of factors that led to Tuesday's tragedy.

In a Wednesday phone interview, Officer Daniel Hill of the California Highway Patrol confirmed that at approximately 10:29 a.m. on Tuesday, the CHP received calls regarding a "despondent female" who had crossed over the rail of the Golden Gate Bridge and jumped into

47.     The administrators – aka corporate officers – avoided a discussion with students, wary not to make a statement that might warrant any further investigation of this matter. Few students knew at the time that the same officers, charged with managing the University's operations, are secretly accessing their psychiatric records without any notice. Instead, these students naively trusted Yale not to engage in any unethical practices, particularly in a topic as sensitive as mental health.

# Tensions flare at mental health forum

**AMAKA UCHEGBU** | 4:26 AM, FEB 26, 2015
STAFF REPORTER

Tensions ran high and voices were raised at yesterday's forum on mental health and counseling. And as students pressured administrators for answers, questions lingered as to whether more transparency would come in the wake of the conversation.

"We appreciate a lot of your rhetoric, but there seems to be a tremendous lack of consistency about what we are hearing from you and the experience that other students are having," said Yale College Council President Michael Herbert '16, standing amidst some 200 seated students at the forum.

Herbert was attempting to extract a commitment from Yale College Dean Jonathan Holloway, who hosted the forum, to respond, point by point, to two YCC reports on mental health, released in the 2013-'14 academic year. He asked that Holloway address the requests outlined in the reports by the end of the 2014–'15 academic year.

Holloway would not commit to doing so.

At 6 p.m. Wednesday evening, students crowded into LC 102 to attend the forum. Joining Holloway on stage were Director of Yale Health Paul Genecin, Mental Health and Counseling Director Lorraine Siggins, MH&C Associate Director Howard Blue and English professor John Rogers, who is heading the committee reviewing withdrawal and readmission policies.

The town hall, which Holloway said was intended to clear up misperceptions about mental health services at Yale Health, quickly became heated, with numerous students directly confronting administrators about their own negative experiences with MH&C.

48.     In the weeks following Wang's death, students and reporters focused on

Yale's withdrawal policies, as they found them on Yale's website. What the students

did not know was that Yale never intended to follow these policies; that Yale had no internal mechanisms to ensure that, or check if, any employees follow these policies; and that details about any particular decision provided to the student would be so scant as to prevent any fact-finding that might overturn them. To date, many of Yale's policies were so vague as to be meaningless, and Yale is unilaterally empowered to interpret them. Many written policies defer responsibility to various internal committees, which often lack any formalities, procedures, or members – that is, they simply did not exist. At all relevant times, Yale's actions were motivated by a questionable belief that making policies ambiguous and unspecific would mitigate litigation liability and benefit the University.

49.    Yale tried to explain away the inconsistencies and apparent arbitrariness of its "policies" by stating that they have a valid interest in admitting people who can handle their coursework and graduate in a timely manner. On other occasions, Yale sought to explain its actions by citing "strict confidentiality", or various kinds of laws, taking opportunity of the fact that students would accept these blanket excuses as valid.

**CONFRONTING CONFIDENTIALITY AND WITHDRAWAL**

Though the forum's tone was confrontational at times, both Genecin and Siggins said they were pleased with student attendees' openness about their struggles with mental health services. Holloway opened the forum by voicing his hopes for a two-way conversation between students and faculty. But in an interview with the News before the forum, Holloway explained that there had been hesitancy about holding the forum in the first place because of fears that, in answering questions, administrators might violate federal confidentiality laws about patient information.

"We can't even come close to describing a stitch that might reveal somebody's identity," he said, adding that panel members ultimately went ahead with the event so that they could receive feedback and dispel myths that they fear are preventing students from getting help when they need it.

Student attendees pushed back against administrators' appeals to confidentiality.

Caroline Posner '17, a staff columnist for the News who suffers from depression, anxiety and Attention Deficit and Hyperactivity Disorder, asked why the number of withdrawals per year is not made public, despite the fact that revealing this information would not identify students.

Genecin said that information is kept at the Yale College Dean's Office.

"I don't have that information," Holloway replied.

*Article dated February 26, 2015.*

50.     What Yale did not reveal, however, is that every enrolled student —

simply by the virtue of being enrolled and doing a nominal amount of work — obtains

grades more than sufficient to graduate. In fact, Yale does not publish — or maintain

— any statistics about its grading system, or the number of students withdrawn for any reason. Yale's executives, whenever asked about such numbers, failed to provide a meaningful answer. This data is readily and freely available at other universities, including the peer colleges in the Ivy League.

## Mental Health at Yale: Part III

51.     A social stigma against persons receiving psychiatric care has persisted for many decades, in courts and at elite universities. Admitting that one has symptoms of depression or anxiety, a very human occurrence, is frequently but wrongly cited as a sign of weakness.

52.     Because their psychiatric needs are poorly understood and regarded with suspicion, students are reluctant to share their thoughts with family or close friends. Many see an opportunity to change this state at on-campus medical clinics, which appear to offer a comprehensive mental health treatment. This is a case at Yale.

53.     Students who schedule an appointment at Yale Health's MH&C department are paired with a psychiatrist, and sometimes a therapist. They meet on a regular basis, and openly discuss the student's private and often embarrassing subjects: sexual abuse, drug use, family issues, personal relationships, mental disorders, and others. The Yale Health therapist is often the only person that the student will reveal these thoughts. That is, the University-employed psychiatrists receive a credit of trust from students.

54.    The psychiatrists at Yale take notes, fill in forms, and maintain records replete with sensitive information about each student who gave them that credit of trust. This is commonly referred to as "mental health records". These records may also include information about one's prior psychiatric history; history of mental health disorders in her family.

55.    A sample record may look like this:

John Doe is a 22-year-old male at Ezra Stiles College. He denies any difficulty with his living situation. He first sought mental health treatment at Yale University on August 29, 2019, at the start of his senior year.

John reported having very few friends, and felt isolated. Although he had established a therapeutic relationship with a mental health care professional and had been seeing her for more than two months, John admitted he did not consult with his therapist when he was feeling suicidal. During the visit, he reported to have been actively suicidal recently, with a plan, the night before. He was still suicidal when evaluated the next day. He was living alone in his college dorm, with no supervision. John was prescribed an additional 30-day supply of Zoloft.

Homicidal Ideation: No homicidal ideation
Thought Content: Within normal limits
Perception: No hallucinations

## Yale's Fraudulent Scheme

56.    Faced with an unpredictable and rising risk after Ms. Wang's death, Yale administrators started accessing student psychiatric information from Yale Health to learn which individuals are more likely to pose a reputational threat to Yale.

57.     Upon information and belief, the said psychiatric information is stored physically at Yale Health facilities at 55 Lock St in New Haven, Connecticut, and in computer systems, including a cloud-based service.

58.     Yale's management has accessed these records to pre-emptively identify potential "more risky" students, and ensure they do not pose a danger to the University's reputation: whether by being part in selected programs within Yale, living with other students, or being enrolled at all. Many students were determined to have been "too much of a risk", and Yale involuntarily withdrew them, officially "for mental health reasons". Yale's executives have also used information found in the psychiatric records to intimidate students who sought redress outside the University.

59.     The conspirators ensured that their conduct leaves no standard written record of disclosure, thus preventing its students from ever being able to learn that their psychiatric information was accessed.

60.     Upon information and belief, Yale regularly pressures students to declare in writing that their withdrawals were voluntary as a business practice to avoid legal liability from students that have been wronged.

## One Story Too Far

61.     Plaintiff has enrolled as an undergraduate student at Yale College in August 2016.

62.     Plaintiff has been treated for depression and attention deficit disorder, and took psychotropic medication as part of his treatment.

63.    On May 27, 2017, plaintiff was a victim of an armed robbery while walking on the streets of Johannesburg, South Africa, shortly after the semester has ended. Plaintiff was brutally stabbed in broad daylight; the assailants cut plaintiff's radial artery, and he lost nearly a liter of blood before being miraculously rescued. Plaintiffs slowly recovered over several weeks. After this incident, plaintiff exhibited symptoms of post-traumatic stress disorder (PTSD).

64.    In 2018, Yale University widely advertised mental health and counseling services offered by Yale Health. Plaintiff learned about MH&C services from official materials published by the University and shared among students through email. A sample brochure is attached as an exhibit.

65.    The University emphasized that information discussed with mental health counselors and psychiatrists at Yale Health is held in the strictest confidence.

66.    Yale Health made additional representations in its official materials, for example:

> "Mental Health & Counseling records for Yale students are separate from other medical records, are excluded from the electronic medical record, and are kept in a locked room in Mental Health & Counseling."

> "Mental Health & Counseling will not release information about a patient to anyone including Heads of College, Deans, parents, family, friends, coaches, employers, or the government without your permission."

> "Everything discussed with a mental health clinician is held in strictest confidence and is not communicated to anyone without your permission, except in the rare instance of a life-threatening situation."

> "Strict standards of confidentiality are always maintained."

> (emphasis added)

67.   Yale Health thus explicitly represented to plaintiff, and all other Yale students, that their "[mental health] records are not released to *anyone*—including other Yale Health clinicians or administrative personnel—without your permission" (emphasis added).

68.   Yale Health stores on its website a form styled "Authorization for Release of Mental Health Record", ostensibly as a lawful mechanism to obtain permission to release students' psychiatric information to third-parties. "Without receipt of this completed form parents or any other persons will not have access to your health information," Yale emphasized.

69.   Relying on these representations, plaintiff scheduled an initial visit at MH&C department of Yale Health. Plaintiff was matched with a psychiatrist, and has had appointments with two psychiatrists and one therapist.

70.   Plaintiff was not presented with a written contract when he first used MH&C services. It is Yale Health's standard business practice not to have an agreement that governs the relationship between the registering student, and the clinic. Yale Health maintains dozens of documents on its websites; they are characterized as policies, notices, and a student handbook.

71.   Plaintiff relayed to his psychiatrist personal information, which he did not communicate to others. This information concerned his history of depression, previous relationships, and his troubles with Yale as an organization.

72.   In January 2020, Plaintiff was involuntarily withdrawn from Yale College. Suspicious about the inner workings of Yale, he investigated Yale's practices and filed a suit, which is co-pending in this District.

73.   At all relevant times, Yale College had accessed plaintiff's psychiatric information, used them to retaliate against the plaintiff and pressure him to drop his investigation and legal action against Yale.

74.   In March 2020, Yale Health has released plaintiff's psychiatric information to Yale University senior management, who forwarded them to several third-party individuals, including defendants ROSE and HENDEL.

75.   Later in March, Plaintiff requested a list of all disclosures of his medical information that Yale Health, or other Yale entities, have made since 2016 until that day.

76.   In response, Yale Health's Chief Privacy Officer represented that no disclosure has been made. Upon knowledge and belief, no meaningful mechanism of any kind exists at Yale Health to ensure that third-party disclosures are logged or saved.

77.   When Yale's management realized that Plaintiff, contrary to their beliefs, knew that Yale's conduct was unlawful and improper, it requested that plaintiff sign a blanket disclosure permitting a release of his medical records to, essentially, everyone, under false pretenses.

78.   Yale University continues to regularly and secretly access student psychiatric information to this day.

COUNT I - FRAUD
(Yale University)

79.    Plaintiff incorporates the foregoing paragraphs by reference.

80.    Connecticut law makes it unlawful for any organization to knowingly make false representations of fact, or to conceal material facts, to induce action by another party, to the detriment of that party.

81.    The fraudulent representation under Connecticut law need not be an affirmative act. "The intentional withholding of information for the purpose of inducing action has been regarded ... as equivalent to a fraudulent misrepresentation." Pacelli Bros. Transp., Inc. v. Pacelli, 189 Conn. 401, 407 (1983).

82.    From July 2014 until today, within the District of Connecticut and elsewhere, YALE UNIVERSITY committed fraud when it intentionally and falsely represented to Plaintiff that it has no means to, and would not access Plaintiff's psychiatric records without his consent when, in fact, it has done without any difficulty.

83.    At all relevant times, Yale knew that Plaintiff would trust its representations, that Plaintiff would not question Yale's representations, and that Plaintiff had no way to independently verify the truthfulness of University's statements.

84.    At all relevant times, Yale intended to deceive Plaintiff that MH&C services are confidential when, in fact, Yale regularly and secretly accessed students' psychiatric records for its business purposes.

85.    Yale committed fraud under Connecticut law when it failed to disclose that its management regularly accessed students' mental health records without their knowledge or consent.

86.    Yale committed fraud under Connecticut law when its management accessed Plaintiff's psychiatric records without his knowledge or consent, while representing that Defendant did not access them.

87.    Yale intended to use its false representations and their misrepresentations and concealments to retaliate against and injure plaintiff in the co-pending case, and did in fact use them for that purpose.

88.    Yale's conduct exhibited reckless disregard for the truth, and are unconscionable in a civilized society.

89.    As a direct and proximate consequence of the conduct by Yale, Plaintiff has been injured in his business and life, causing Plaintiff to suffer monetary damages in an amount not less than $700,000, said damages to be proven at the time of trial.

90.    Because of Yale's frauds as described herein, Yale is liable to Plaintiff for costs and disbursements in an amount to be determined at trial.

91.    Yale's conduct as alleged above was done in furtherance of its own private interests. Yale's conduct was willful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences and with specific intent to harm.

92.    Plaintiff is therefore entitled to an award of punitive damages from Defendant in an amount to be proven at trial and sufficient to punish, penalize and deter Defendant from engaging in such conduct in the future.

## COUNT II – DECLARATORY JUDGMENT
### 28 U.S.C. § 2201
(Yale Health)

93.    Plaintiff is entitled to declaratory relief establishing that Yale maliciously injured him with conduct that was intentional and retaliatory.

94.    Plaintiff, pursuant to 28 U.S.C. § 2201, seeks a declaration that Yale (a) knew or should have known that Plaintiff's psychiatric records are a strictly confidential information which Yale lacks a right to disclose to third parties; (b) had a duty to protect the student psychiatric records from unauthorized access within Yale University; (c) willfully and intentionally concealed material information concerning its internal mechanisms that enabled authorized disclosure of psychiatric records without notice; and (d) engaged in actions that endangered its students who sought mental health and counseling services from YALE HEALTH, and whose confidential information was used against their will and without their consent.

95.    This Court should declare that a university's management cannot lawfully access student psychiatric records absent an explicit and informed consent of that student, it being immaterial whether these records were created at the university's subsidiary or a third-party facility.

96.    This Court should create an independent cause of action for malicious breach of trust to enable individual plaintiffs to seek redress whenever their university's management accesses confidential information about them with intent to injure.

97.    The court should enter a final declaratory judgment in favor of Plaintiff and against all Defendants on both issues above, pursuant to 28 U.S.C. § 2201.

98.    The court should enter any necessary or proper relief based on the declaratory judgment above, pursuant to 28 U.S.C. § 2202.

<u>COUNT III – FRAUD</u>
(Yale Health)

99.    Plaintiff incorporates the foregoing paragraphs by reference.

100.    On or about the dates set forth below, within the District of Connecticut, and elsewhere, the defendant,

YALE HEALTH

operated a scheme and artifice to defraud as to a material matter and to obtain money by means of materially false and fraudulent representations, specifically by falsely advertising to Yale University students that its mental health services are confidential, and by soliciting, encouraging, or otherwise inducing Yale University employees to refer students to enroll and use its mental health and counseling services under the false and fraudulent pretense that YALE HEALTH ensures

confidentiality of each customer's data and that a customer has a right to approve disclosure of such data to third parties.

101.   From 2017 through the present, YALE HEALTH has intentionally and falsely represented to Plaintiff that his psychiatric information is held confidential, separately from other medical records, and is not made available to anyone without Plaintiff's explicit consent when, in fact, YALE HEALTH regularly permitted and enabled Yale University administration to access this confidential and sensitive information.

102.   At all relevant times, YALE HEALTH falsely represented, and continues to represent, that Yale students' psychiatric records are kept separate from other medical records in a locked room, and are excluded from the electronic medical record when, in fact, they are easily accessible to anyone within Yale senior management.

103.   YALE HEALTH made these statements on its official website, in its advertising materials, and a student handbook.

104.   From 2017 through the present, YALE HEALTH has intentionally and falsely represented to Plaintiff that it informs patients of their rights to approve or refuse release of their psychiatric information to any individual outside the facility, and assure the confidential treatment of patients' personal and medical records when, in fact, YALE HEALTH never took such actions, nor has it intended to take them.

105.   At all relevant times, YALE HEALTH knew that Plaintiff had no reason to question the veracity of its representations, and that Plaintiff lacked an ability to independently verify the truthfulness of YALE HEALTH's statements.

106.   YALE HEALTH has intentionally and falsely represented, and continues to represent, that it ensures each patient:

   i.   is fully informed of their rights, and of all rules and regulations governing patient conduct;

   ii.   is assured confidential treatment of their personal and medical records;

   iii.   may approve or refuse their release to any individual outside the facility;

   iv.   is fully informed of the existence of business relationships between YALE HEALTH and other healthcare providers or commercial entities;

   v.   has their privacy respected;

   vi.   is treated with consideration, respect, dignity, and individuality including privacy in treatment and care.

107.   In reality, YALE HEALTH has not taken any action to advance any of the declarations stated above.

108.   YALE HEALTH made its representations to induce Yale students, including the plaintiff, to seek mental health treatment on campus rather than elsewhere, and to create a perception of quality services while preserving the unimpeded access to students' most sensitive information in furtherance of Yale University's business interests.

109.   Plaintiff did not know at the time YALE HEALTH represented its services as "confidential therapy" that his records were surveilled, and could be, and in fact were, accessed at will by the University without permission, as a sham arrangement to circumvent lawful business practices.

110.   Plaintiff justifiably relied upon YALE HEALTH's false representations, misrepresentations, and omissions, and had no means to discover YALE HEALTH's deceit.

111.   YALE HEALTH acted with knowledge and reckless disregard as to the truth of its communications described herein.

112.   YALE HEALTH perpetrated a fraud upon Plaintiff as set forth above.

113.   As a direct and proximate consequence of YALE HEALTH's material misrepresentations, omissions, transactions, practices, and course of business, Plaintiff suffered damages.

114.   YALE HEALTH's fraud caused Plaintiff to suffer monetary damages in an amount not less than $700,000, to be proven at trial.

115.   Defendants' conduct as alleged above was done in furtherance of their own private interests, and was willful, malicious, wanton, and oppressive, and done with conscious and callous indifference to the consequences and with specific intent to harm.

116.   Accordingly, Plaintiff is entitled to an award of punitive damages from Defendants and each of them in an amount to be proven at trial but no less than $5.5

million and sufficient to punish, penalize and deter Defendants from engaging in such conduct in the future.

## COUNT IV – FRAUDULENT MISREPRESENTATION
(Yale Health)

117.    Plaintiff incorporates the foregoing paragraphs by reference.

118.    Between February 2018 and August 2020, both dates being approximate and inclusive, in the District of Connecticut,

### YALE HEALTH

has falsely represented, and continues to represent, on its website and its official materials distributed to potential and current customers, that Plaintiff's medical records are "strictly confidential", "stored in a restricted area" and available only to authorized administrative personnel; that "no one else is authorized to obtain information from [Plaintiff's] records without [his] written consent"; and that these records "are not released to anyone—including other YALE HEALTH clinicians or administrative personnel—without [Plaintiff's] permission" when, in fact, these records have been readily available to anyone within YALE HEALTH or Yale University's management who requested them; YALE HEALTH lacked any mechanism to ensure that an unauthorized individual may obtain information from Plaintiff's records, and leave no trace of unauthorized access.

119.    At all relevant times YALE HEALTH knew, or should have known, that its representations are false.

120.    Plaintiff justifiably relied on YALE HEALTH's statements in, without limitation, choosing his mental health services, and recommending them to other individuals.

121.    Plaintiff suffered measurable harm as a result of the Yale's fraudulent information or statement, and is entitled to damages in an amount to be determined at trial.

## COUNT V – THE CONNECTICUT UNFAIR TRADE PRACTICES ACT
Conn. Gen. Stat. § 42-110b(a)
(Yale University, Yale Health)

122.    Plaintiff incorporates the foregoing paragraphs by reference.

123.    The Connecticut Unfair Trade Practices Act prohibits any person or entity from engaging in deceptive acts or practices, as well as unfair acts or practices in the conduct of any trade or commerce.

124.    The elements of a deceptive act or practice under CUTPA are as follows:

   i.    There must be a representation, omission or other practice likely to mislead consumers;

   ii.   Consumers must interpret the message, omission or practice reasonably under the circumstances;

   iii.  The misleading representation, omission or practice must be material – that is, likely to affect consumer decisions or conduct.

*Caldor, Inc. v. Heslin*, 215 Conn. 590, 597, 577 A.2d 1009 (1990).

125.    At all relevant times, Yale University offered educational services in Connecticut, and was an "entity" within the meaning of CUTPA. Tied in every

contract extended by Yale to its students is "free" access to mental health and counseling services at YALE HEALTH. In other words, every Yale student is granted a contractual right to seek MH&C services by the virtue of their enrollment.

126.    Strict confidentiality is a material element of every relationship between a patient seeking mental health treatment and the institution providing that treatment. In other words, a reasonable student would refuse to accept YALE HEALTH's services had she known that YALE HEALTH might, and likely would, use the information obtained during treatment against her; or had she known that unauthorized individuals at Yale University could access this information to determine whether she should be withdrawn from the University.

127.    It is an industry standard, and an ordinary common sense, that a mental health provider must obtain informed consent of any individual to release any psychiatric information of that individual to other people or entities.

128.    Yale University and YALE HEALTH falsely represented that YALE HEALTH's mental health services are confidential, as outlined above.

129.    Plaintiff entered into a direct customer relationship with Yale University by enrolling in its educational program. Access to MH&C services was an integral and material part of that relationship.

130.    Plaintiff entered into a direct consumer relationship with YALE HEALTH by using its MH&C services.

131.    Yale University knew that students would rely on Yale's promise, had reason to believe that Yale was offering fully honest services, and would not investigate Yale's business practices.

132.    At no time throughout plaintiff's relationship with YALE HEALTH did Yale University reveal that it regularly accessed plaintiff's psychiatric information without knowledge or consent.

133.    Yale University and YALE HEALTH breached CUTPA by, without limitation:

    iv.    intentionally and falsely misrepresenting that its mental health services are confidential;

    v.    falsely representing that YALE HEALTH adequately safeguards student psychiatric information;

    vi.    intentionally accessing students' and Plaintiff's psychiatric records without ever intending to seek their permission, agreement, or consent;

    vii.    failing to provide clear information about its unethical business practices;

    viii.    misleading their customers, including Plaintiff, that they have rights to confidential treatment when, in fact, they took affirmative steps to deprive customers, including Plaintiff, of any ability to enforce these rights;

ix.   impeding students' ability to understand their rights as customers of YALE HEALTH, which is necessary element for students to make an informed decision to agree, or decline, YALE HEALTH's services.

134.   Yale has intentionally and persistently misrepresented the material elements of its conduct that remained unknown to Yale's customers.

135.   Yale University's trade practices, as outlined above, offend public policy and constitute an unconscionable betrayal of trust between Yale and its students in that no reasonable customer would agree to them absent misrepresentation or fraud.

136.   Yale's conduct was unethical and unscrupulous because its victims were in no position to identify Yale's dishonest conduct, meaningfully question it, and seek any redress.

137.   Yale's trade practices are immoral, unethical, oppressive and unscrupulous in that they targeted students in their most vulnerable moments, when they were least likely to understand Yale's unlawful conduct and question its deceptiveness.

138.   Yale's conduct was unfair and deceptive because Yale never sought, or intended to seek, patients' permission to access their psychiatric records before doing so, knowing that any reasonable consumer would decline to consent to such access.

139.   Yale students, including Plaintiff, could not reasonably have avoided injury arising from Yale's unlawful conduct.

140.   Defendant's conduct was done with a reckless indifference to the plaintiff's rights in a fashion that is utterly intolerable in a civilized society.

141. Yale has attempted to conceal its misrepresentations or was an intentional or wanton violation of those rights, as outlined above.

142. As a direct and proximate result of Yale's deceptive conduct, Plaintiff suffered an ascertainable loss in that he was deprived of his privacy, sense of dignity, and suffered damages, both physical and mental.

143. Plaintiff is entitled to punitive damages at an amount to be determined at trial but no less than $1,000,000, attorney's fees and costs.

COUNT VI – FRAUDULENT INDUCEMENT
(Yale University, Yale Health)

144. Plaintiff incorporates the foregoing paragraphs by reference.

145. Fraud in the inducement occurs when an entity tricks a person into entering an agreement to that person's disadvantage by using fraudulent statements and representations.

146. Plaintiff entered into a valid, enforceable agreement with Yale University when he accepted Yale's offer of admission as an undergraduate student in April 2016. Tied into this contract were various ancillary services that Yale extends to its students, and to its students only, in exchange for binding enrollment and payment of fees.

147. As part of this contract Yale offered, among other things, mental health and counseling services at its on-campus clinic, aka YALE HEALTH. Yale advertised these services as confidential. Had plaintiff known the information gathered in the course of treatment could, and in fact would be used against his will, he would not have sought services of YALE HEALTH MH&C.

148.   Plaintiff also entered into a valid, enforceable agreement with YALE HEALTH when he sought mental health and counseling service there. No one written agreement governed the parties' rights and obligations. YALE HEALTH did not present any written agreement for acceptance or signature to Plaintiff when it accepted him as a customer. Confidentiality was a material part of the contract.

149.   Yale University fraudulently induced Plaintiff into entering a contract with YALE HEALTH when it falsely advertised its services as confidential.

150.   YALE HEALTH breached the contract in that it has failed and neglected to perform the confidentiality provision that was a material obligation of YALE HEALTH as the service provider.

151.   As a direct and proximate result of Yale's above-alleged material breaches of their obligations under the contract with Plaintiff, Jakub has suffered damages in an amount to be proven at trial.

## COUNT VII – AIDING AND ABETTING FRAUD
(Patrick M. Noonan)

152.   Plaintiff incorporates the foregoing paragraphs by reference.

153.   In Connecticut, a party may be guilty of aiding and abetting fraud when:

   a)  the party aided by the defendant performed a wrongful act;

   b)  the defendant was generally aware of his role as part of an illegal or tortious activity at the time he provided the assistance; and

   c)  the defendant knowingly and substantially assisted the principal violation.

In re Colonial Ltd. P'ship Litig., 854 F. Supp. 64, 102-03 (D. Conn. 1994).

154.   Yale University and Yale Health engaged in fraud, as detailed above.

155.   Patrick M. Noonan was admitted to Connecticut Bar in 1977. Before admission, he took an oath of an attorney. He then solemnly affirmed, that "[he] will do nothing dishonest, and will not knowingly allow anything dishonest to be done in court, and that [he] will inform the court of any dishonesty of which [he] have knowledge; that [he] will not knowingly maintain or assist in maintaining any cause of action that is false or unlawful; that [he] will not obstruct any cause of action for personal gain or malice; but that [he] will exercise the office of attorney, in any court in which [he] may practice, according to the best of [his] learning and judgment, faithfully, to both [his] client and the court; so help [him] God or upon penalty of perjury."

156.   Patrick M. Noonan knew of the fraud because he actively consulted Yale on strategies to minimize legal liability by obstructing students' access to their information, both on a regular basis and once litigation has commenced. Patrick M. Noonan represented Yale University more than 110 times in federal and state courts starting 1989, and Yale entities (i.e. including Yale-New Haven Hospital) are almost exclusive clients of Mr. Noonan and his law practice. Thanks to his decadeslong tenure as a purportedly outside counsel at Yale, Mr. Noonan had actual knowledge of the University's internal processes and ways to obfuscate them to prevent a reasonable observer from collecting material to make their case in the courts.

157.   Patrick M. Noonan was a culpable participant because he actively solicited student's psychiatric information from Yale at various stages of prospective and actual litigation, starting no later than February 2017, with an intent of injuring the owner of that information – i.e. the wronged student – and intimidating them into dropping their suit against Yale.

158.   Patrick M. Noonan was incentivized to this fraudulent conduct because more than 95% of his business since early 1990s consisted of representing Yale University and Yale-New Haven Hospital, a loss of which would have been a massive blow to his law firm.

159.   Patrick M. Noonan actively participated in the fraud and provided assistance to the fraud by, without limitation, requesting, accessing, and using information that he knew, or should have known, that was protected under contractual provisions, federal statutes, and ordinary sense of what is right, and what is wrong.

160.   (In doing so, Patrick M. Noonan grossly violated his ethical duty to the Court.)

161.   Patrick M. Noonan's actions constituted aiding and abetting, for which he is liable.

162.   As a result of defendant's violations, Plaintiff suffered damages in an amount to be proven at trial.

## COUNT VIII – CIVIL CONSPIRACY
(Patrick M. Noonan, Harold Rose, Caroline G. Hendel, Does 1-10)

163.   Plaintiff incorporates the foregoing paragraphs by reference.

164.   The elements of a civil action for conspiracy under Connecticut law are:

   a)  a combination between two or more persons;

   b)  to do a criminal or an unlawful act or a lawful act by criminal or unlawful means;

   c)  an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object;

   d)  which act results in damage to the plaintiff.

Macomber v. Travelers Prop, 277 Conn. 617, 636 (Conn. 2006)

165.   Upon knowledge and belief, Defendant NOONAN has conspired and agreed with other Yale employees, including DOES 1-10, ROSE and HENDEL, to facilitate exchange of student psychiatric information without a record of disclosure mandated by law, knowing at all relevant that they were not authorized to access said information.

166.   Plaintiff will supplement the record with detailed means and acts of the conspiracy as discovery progresses.

167.   Upon information and belief, in furtherance of this conspiracy, NOONAN, acting in agreement and concert with other Yale employees did in fact access student psychiatric information despite knowledge that he is not authorized to do so, and did so in a manner that left no trace of disclosure.

168.   As a direct and proximate result of the above-alleged agreement and acts performed pursuant to the conspiracy by Noonan and other Yale employees, Jakub has suffered injury and damages in an amount to be proven at trial.

169.   NOONAN willfully and maliciously engaged in the above-alleged conspiracy and agreement with other Yale employees. As a result, Jakub is entitled to an award of exemplary damages.

## COUNT IX – NEGLIGENCE
(Paul Genecin, Lorraine Siggins)

170.   Plaintiff incorporates the foregoing paragraphs by reference.

171.   At all relevant times, Paul Genecin and Lorraine Siggins owed Plaintiff a duty by virtue of their employment at YALE HEALTH in managerial and executive capacities, respectively as a chief executive officer and a chief of MH&C department.

172.   Defendants Genecin and Siggins breached their duty by, among others, allowing the stated fraud to occur at YALE HEALTH, not taking a supervisory or corrective action to ensure the fraud was not occurring; and permitting deceptive advertising of YALE HEALTH's services, which included false representations of material facts. Defendants should have known that practices described herein are unlawful, and offend public policy.

173.   Defendants' conduct resulted in damages to Plaintiff in an amount to be determined at trial.

## PRAYER FOR RELIEF

Plaintiff prays for the following judgment in his favor and against the Defendants:

A. Entering an order permanently enjoining Yale University, along with their agents, employees, and those acting in concert therewith, from accessing student psychiatric information absent each student's explicit and informed consent;

B. Establish an independent cause of action for a violation of the said order, permitting individual plaintiffs to obtain monetary redress, including punitive damages, for each violation;

C. Entering a declaratory judgment as requested above, pursuant to 28 U.S.C. § 2201;

D. Awarding Plaintiff monetary damages in an amount not less than $700,000, said amount to be proven at trial;

E. Awarding Plaintiff his litigation expenses, including reasonable attorneys' fees, costs, and disbursements;

F. Awarding Plaintiff punitive damages in the sum of not less than $5,500,000 or an amount otherwise to be decided by a jury; and

G. Granting such other relief as the case may require or as the court may deem proper and equitable.


## DEMAND FOR JURY TRIAL

Jakub Madej demands a trial by jury of all triable issues, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

<u>RESERVATION OF RIGHTS</u>

Plaintiff reserves its right to further amend this Complaint, upon completion of its investigation and discovery, to assert any additional claims for relief against Defendants or other parties as may be warranted under the circumstances and as allowed by law.

Dated:  August 28, 2020                    Respectfully submitted,
        New York, NY                        By: <u>/s/ Jakub Madej</u>
                                            Jakub J. Madej
                                            FACTS ABOUT YALE, LLC
                                            415 Boston Post Rd Ste 3-1102
                                            Milford, CT 06460
                                            T: (203) 928-8486
                                            F: (203) 902-0070
                                            E: j.madej@lawsheet.com

                                            *Counsel for Plaintiff*